

**ROBERT LANGERMANN**
P.O. Box 19724
Las Vegas, Nevada  89132
Phone: (702) 435-3156
Fax:   (702) 458-4014
Plaintiff in Proper Person

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT LANGERMANN, | ) |
| | ) |
| Plaintiff, | ) **CASE NO.:** 14cv22531 |
| | ) |
| v. | ) |
| | ) |
| SAMUEL J. DUBBIN; JONATHAN W. CUNEO; | ) **FIRST AMENDED** |
| STEVE W. BERMAN: ILYA "ELIE" RUBINSTEIN; | ) **COMPLAINT** |
| DAVID C. WROBEL; THE BLUE CARD, INC.; | ) |
| JEWISH FAMILY SERVICE AGENCY ; | ) |
| JOHN DOES I-XX; and | ) |
| ROE CORPORATIONS XXI-XL. | ) **JURY DEMAND** |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

**COMES NOW**, ROBERT LANGERMANN, Plaintiff in Proper Person,

and herein, upon information and belief, complains and alleges as follows:

### PRELIMINARY STATEMENT

1.      This action is brought to recover damages for Defendants' actions surrounding the

Court's order granting Motion to Authorize Disbursement of the Remaining Funds, dated July

10, 2012. (D.E. 327, *Rosner v. USA*, Case No. 1:01-cv-01859-PAS, United States District Court,

Southern District of Florida)

2.       Plaintiff brings this action for compensatory damages, punitive damages, and attorney's fees, for the wrongful acts of Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., Jewish Family Service Agency of Las Vegas, and/or Does and Roes, acting under the color of law and Federal authority in violation of Plaintiff's rights secured by the Civil Rights Act of 1871, 42 U.S.C.A. §§§§ 1981, 1983, 1985, 1988, by the United States Constitution, including its 1st, 4th, 5th, 8th, and 14th Amendments; and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S. Ct. 199, 29 L. Ed. 2d 619 (1971), as well as 18 U.S.C.A. §§§ 241, 242, 245, and certain state torts.

## SUBJECT MATTER JURISDICTION

3.       Subject matter jurisdiction of this Honorable Court is invoked pursuant to 28 USC § 1331 federal question jurisdiction, 28 USC § 1343 civil rights, and elective franchise jurisdiction; and Plaintiff invokes the supplemental jurisdiction of this Honorable Court to hear his pendent state tort claims, pursuant to 28 USC §1367, supplemental jurisdiction. Additionally, this court has jurisdiction pursuant *to Irving Rosner, et al., on behalf of themselves and all others similarly situated v. United States of America*, Case No.: 1:01-cv-01859-PAS, United States District Court, Southern District of Florida whereby, this court has retained the following jurisdiction:

> "Without Affecting the finality of this Final Order and Judgment, this Court shall retain exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final order and Judgment, including all matters relating to the consummation, performance, and enforcement of the Settlement Agreement." (*Rosner* D.E. 246, p.22)

## PERSONAL JURISDICTION

4.      This Honorable Court has personal jurisdiction over all parties, as they are all citizens of the United States.  Personal jurisdiction of this Honorable Court is further invoked pursuant to 28 USC § 1332, as this action is between citizens of different states.  Amount in controversy is immaterial pursuant to 28 USC § 1331, 28 USC § 1343, 42 USC §§ 1981, 1983, 1985, 1988.  Additionally, this Honorable Court has personal jurisdiction over all parties pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as pursuant *to Irving Rosner, et al., on behalf of themselves and all others similarly situated v. United States of America*, Case No.: 1:01-cv-01859PAS, United States District Court, Southern District of Florida, whereby this court has retained the following jurisdiction:

> "Without Affecting the finality of this Final Order and Judgment, this Court shall retain exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final order and Judgment, including all matters relating to the consummation, performance, and enforcement of the Settlement Agreement." (*Rosner* D.E. 246, p.22)

### VENUE

5.      Venue is properly in the United States District Court, Southern District of Florida, pursuant to 28 USC § 1391(b)(2) and pursuant *to Irving Rosner, et al., on behalf of themselves and all others similarly situated v. United States of America*, Case No.: 1:01-cv-01859PAS, United States District Court, Southern District of Florida, whereby this court has retained the following jurisdiction:

> "Without Affecting the finality of this Final Order and Judgment, this Court shall retain exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, Conditions and obligations of this Final order and Judgment, including all

matters Relating to the consummation, performance, and enforcement of the Settlement Agreement." (*Rosner* D.E. 246, p.22)

## PARTIES

6.    Plaintiff Robert Langermann is, and at all relevant times hereto, was a resident of Clark County, Nevada.  Langermann is, and at all relevant times hereto was a single man. Langermann was born in Budapest, Hungary, in the year 1935.  Langermann resided in Budapest, Hungary, from the date of his birth, until 1949.  Langermann is a survivor of the Holocaust.  Langermann immigrated to the United States in the year 1958, in pursuit of life, freedom and liberties, as afforded by the Constitution of the United States.  Langermann has become a citizen of the United States of America in the year 2002, and received his Certificate of Naturalization in the State of Nevada.  Said Certificate of Naturalization states Langermann's marital status as "single."

7.    Defendant Samuel J. Dubbin is a resident of Coral Gables, Florida.  Dubbin is an American lawyer and a principal in the law firm Dubbin & Kravetz, of Coral Gables, Florida. Dubbin as a lead counsel, represented Plaintiffs and class members, including Langermann, in the underlying action, known as the "Hungarian Gold Train" case, *Irving Rosner, et al v. United States of America*, case No. 01-1839-civ-PAS; United States District Court, Southern District of Florida.  Dubbin, under color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights, as alleged herein.

8.    Defendant Jonathan W. Cuneo is a resident of Washington, D.C., and is an attorney and a partner in the law firm of Cuneo, Gilbert, and LaDucca.    At all relevant times, Cuneo as lead counsel represented plaintiffs and class members, including Langermann, in the underlying action, known as the "Hungarian Gold Train" case, *Irving Rosner, et al. v. United*

*States of America*, case No. 01-1859-civ-PAS; United States District Court, Southern District of Florida. Cuneo, under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights as alleged herein.

9.      Defendant Steve W. Berman is a resident of Seattle, Washington, and is an attorney and partner in the law firm of Hagens Berman. At all relevant times, Berman as lead counsel represented plaintiffs and class members, including Langermann, in the underlying action, known as the "Hungarian Gold Train" case, *Irving Rosner, et al. v. United States of America*, case No. 01-1859,civ-PAS; United States District Court, Southern District of Florida. Berman, under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights as alleged herein.

10.      Defendant Ilya "Elie" Rubinstein is a resident of Brooklyn, New York and at all relevant times was the Executive Director of Defendant The Blue Card, Inc. Rubinstein, under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights as alleged herein.

11.      Defendant David C. Wrobel is a resident of the State of New York, is an attorney and a partner in the law firm of Wrobel & Schatz. At all relevant times Wrobel was the First Vice President of Defendant The Blue Card, Inc. Wrobel, under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights as alleged herein.

12.      Defendant The Blue Card, Inc. is a Domestic Not-For-Profit Corporation domiciled in the State of New York. It was established on August 26, 1943, for the purpose of aiding refugees of Nazi persecution resettling in America. At all relevant times, The Blue Card, Inc. was designated by the "Claims Conference" with the approval of the Court and Class

Counsel to administer Langermann's "Grants" derived from the settlement funds of the underlying case, known as the "Hungarian Gold Train" case. The Blue Card, Inc., under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights, as alleged herein.

13.     Defendant Jewish Family Service Agency is a Domestic Not-for-Profit Corporation, domiciled in Clark County, Nevada. At all relevant times, with the approval of the court and class counsel, the Jewish Family Service Agency was designated as the local social Service agency to coordinate Langermann's requests for "Hungarian Gold Train" benefits. The Jewish Family Service Agency, under the color of law, has conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights.

14.     The true names and capacities whether individual, corporate associates, co-partnerships or otherwise of Defendants John Does I-XX and Roe Corporations XXI-XL are unknown to Plaintiff, who therefore sues said Defendants by fictitious names. Plaintiff alleges that each named defendant herein designated John Doe or Roe Corporation has under the color of law conspired and engaged in the deprivation of Langermann's constitutional and federally protected rights and is negligently, willfully or otherwise legally responsible for the events and happenings herein referred to and proximately caused damages and injury thereby to Plaintiff, as alleged herein. Plaintiff will ask leave of the Court to amend this complaint to insert the true names and capacities of such Defendants when the same has been ascertained, and will further ask leave to join said Defendants in these proceedings.

15.     At all material times and during the acts alleged herein, Defendants The Blue Card, Inc. and Jewish Family Service Agency, have acted by and through their officers, agents, employees, including the fictitious Defendants named herein, each of whom "under the color of

law conspired and engaged in a deprivation of Langermann's constitutional and federally protected rights, and each of whom was acting negligently, willfully or otherwise, within the purpose and scope of his or her agency or employment; and whose acts and conduct alleged herein were known to, authorized and ratified by Defendants The Blue Card, Inc. and Jewish Family Service Agency.

## GENERAL ALLEGATIONS

16.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 15 as though fully set forth herein and further alleges as follows:

17.     Beginning in April 1944, valuable personal property belonging to the Jewish population of Hungary was confiscated by the Hungarian government, including Plaintiff's family. In late 1944, a portion of the confiscated property was loaded on a train and taken to Austria where it ultimately fell into the hands of the U.S. Army on May 11, 1945. Before arriving in Austria, however, a significant portion of the valuable property from the train was off-loaded to trucks and taken to French occupied Austria. This portion of the Gold Train Property never came into U.S. custody. The property on the train that did come under U.S. custody was placed in a warehouse under U.S. Army control in Salzburg, Austria, where some of it was "requisitioned" by senior U.S. Army officers and stolen by U.S. Army enlisted personnel and others. Subsequently the U.S. Government claimed that the property could not be identified as to ownership or national origin, and thereafter turned the bulk of the remaining property over to the Inter-Governmental committee on Refugees, which auctioned some of the property in New York City in 1948-1949. Despite the efforts of the Hungarian Jewish community to secure the return of the Gold Train Property, none of the property was ever returned by the United States to its rightful owners. On October 7, 1999, the Presidential Advisory Commission on Holocaust

Assets in the United States published its Progress Report on: The Mystery of the "Hungarian Gold Train" in which the United States for the first time, publicly revealed its role in the receipt, handling and disposition of the "Gold Train" Property."

18.     In 2001, the underlying action, known as *Irving Rosner, et al., v. United States of America*, case No. 01-1859-civ-PAS, was filed in the United States District Court for the Southern District of Florida, for the recovery of the stolen properties.

19.     During the pendency of the underlying case, numerous political dignitaries, including but may not be limited to Senator Hilary Clinton and Congressman Jose E. Serrano of New York, have addressed Congress  (Congressional records E1510, dated July 22, 2004; S9215, dated May 24, 2004; and S11291, dated October 11, 2004) and urged the Justice Department to resolve these issues, since after half a century of silence and cover-up, the Federal Government stated that the Gold Train was an "egregious failure of the United States to follow its own policy regarding restitution of Holocaust victims property after World War II." They further criticized the Justice Department for litigating the case in a manner that appears to ignore its moral dimensions.

20.     The case settled in 2005, and a Final Order and Judgment signed and entered by the Honorable Judge Patricia A. Seitz, on September 30, 2005 (*Rosner* D.E. 246).

21.     The settlement created a Settlement fund of $25 million, deposited by Defendants U.S.A. into an interest bearing escrow account.  Of this amount, approximately $21 million will be distributed as described in the "Plan of Allocation" for social services and  humanitarian relief to eligible victims of Nazi persecution, who are in need as defined in the Settlement Agreement.

22.     As part of the settlement, the United States issued a statement of apology which in part provided:

"The United States regrets the improper conduct of certain of its military personnel and seeks in this settlement to provide meaningful assistance to those Hungarian Holocaust Survivors still living who qualify as financially needy." (*Rosner* D.E. 253)

23.    In that underlying case, *Rosner et al, v. U.S.A.,* the class members, including Langermann, were represented by Court-appointed attorneys, including Defendants Dubbin, Cuneo and Berman who acted as lead counsel.

24.    On June 17, 2005, Class Counsel filed with the Court their Verified Joint Petition for an Award of Attorneys' Fees and Expenses.  (*Rosner* D.E. 212)  In said Petition, Class counsel, including Dubbin, Cuneo and Berman informed the court that **"Hungarian Holocaust survivors are elderly, and the time to provide them with meaningful relief is running out."** (@ p.14)  They also indicated that "Class Counsel's commitment of time and resources is ongoing, and will continue even beyond consummation of the settlement, through implementation over the next several years." (@ p. 7)  During the distribution of Hungarian Gold Train Settlement funds, Class Counsel Dubbin, Cuneo and Berman tortuously disregarded their own statements.

25.    At a hearing on March 17, 2005, Class Counsel Cuneo personally assured the Court that the class and class members will continue to be represented by all three firms over the life of the settlement.  (*Rosner* D.E. 195, pg. 41)   As alleged herein, Defendants Dubbin, Cuneo, and Berman continuously denied representation of Langermann rendering the above-promises blatantly false.

26.    Based on reliance of Class Counsel's promises of their ongoing and continued time and resources through implementation over the next several years, the court awarded Class counsel, including Dubbin, Cuneo and Berman, $3.85 million in attorneys' fees, and directed the

Escrow agent to pay such fees and expenses from the settlement funds to the attorneys. (*Rosner* D.E. 246, pg. 22)

27.     Class Counsel Dubbin, Cuneo and Berman, misrepresented their duty of implementation, and breached their obligations of continued representation involving Langermann. They totally failed and refused to implement the Settlement Order and the Court approved Plan of Allocation involving Langermann as alleged herein.

28.     Class Counsel Dubbin, Cuneo and Berman have treated themselves differently and more favorably than their clients, including Langermann herein, by accepting and taking their legal fees upfront from the Settlement Fund, while allowing their clients, including Langermann herein, to struggle for every dollar from the Settlement Fund, over the next several years.  Class Counsel Dubbin, Cuneo and Berman's described actions were in breach of the Covenant of Good Faith and Fair Dealings, and is a fraud upon the class members, including Langermann.

29.     Class Counsel Dubbin, Cuneo, Berman, and the Court approved and adopted a Plan of Allocation prepared by the Conference on Jewish Material Claims Against Germany, Inc. (Claims Conference) a State of New York, Domestic Not-for-Profit Corporation, established in 1952 for the purpose of aiding Jewish victims of Nazi persecution.

30.     Pursuant to the terms of the court approved "Plan of Allocation," Langermann herein is a preferred recipient of Hungarian Gold Train benefits.

31.     Pursuant to the Plan of Allocation, funds will be allocated to agencies on an annual basis for the five-year period of 2006-2010.  Additionally, pursuant to the Court's Order of July 10, 2012, the remaining funds of the $464,553.56, were allocated to certain agencies, including Defendant The Blue Card, Inc. for distribution during 2012/2013.

10

32.     The Plan of Allocation stated that the social workers employed by the distributing agencies are trained in case management.

33.     The Plan of Allocation also stated that there was concern that the social service agencies need to be compassionate and respectful, understanding that beneficiaries need to be made to feel that they are not beggars or supplicants, as this settlement is from funds that are being "returned" to class members.

34.     Langermann's case was assigned to Defendants Jewish Family Service Agency (JFSA) and The Blue Card, Inc.

35.     The various associates, including case workers, managers, directors, attorneys and others, assigned to Langermann's case by The Blue Card, Inc. and JFSA, had no knowledge or understanding of the terms of the "Hungarian Gold Train Settlement" and the Court approved Plan of Allocation.

36.     Both The Blue Card, Inc. and JFSA had a duty of reasonable care owed to Langermann to hire competent and qualified associates.

37.     Both The Blue Card, Inc. and JFSA had a duty of reasonable care owed to Langermann, to train their associates concerning the implementation of the Settlement Agreement and the Plan of Allocation.

38.     Both The Blue Card, Inc. and JFSA had a duty of reasonable care owed to Langermann to supervise their associates, concerning their actions, with regard to the implementation of the Settlement Agreement and the Plan of Allocation.

39.     The failure of The Blue Card, Inc. and JFSA to exercise reasonable care caused Langermann injuries and loss.

40. At all relevant times hereto, both The Blue Card, Inc. and JFSA failed to comply with the guidelines of the Court approved Plan of Allocation as alleged herein.

41. The Court approved Plan of Allocation provides in pertinent part:

"Required Documentation:

Applicant must provide documentation regarding
income and assets; if unwilling, then assessment/home visit
by a social worker will be necessary to determine need."
(*Rosner* D.E. 263, pg. 52)

42. There is no provision in either the Settlement Agreement or the Court approved Plan of Allocation requiring applicants to provide an authorization for the release of "unlimited" information and home searches.

43. Defendant The Blue Card, Inc.'s requests of unlimited documentation and home searches as adopted by each Defendant herein exceeded the requirements set forth in the Plan of Allocation.

44. At all relevant times hereto, Langermann provided to The Blue Card, Inc. and JFSA each and every specified documentation requested of him, thereby complying with the requirements of the Plan of Allocation.

45. On March 3, 2010, the Court, contrary to the Plan of Allocation, without the support of any factual and legal authority and without probable cause, authorized an unnecessary, unreasonable and warrantless search of Langermann's home and papers and the seizure of Langermann's Hungarian Gold Train benefits.  In doing so, the Court has, contrary to the Plan of Allocation, authorized Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes to perform illegal actions resulting in the seizure of Langermann's Hungarian Gold Train benefits, relating to the year 2012 as made available by the Court's Order of July 10, 2012.

12

46.     The March 3, 2010 Court Order (*Rosner* D.E. 295) was without the support of any factual or legal authority, and was in contradiction of the Settlement Order and the Court approved Plan of Allocation.  It was without probable cause and without a warrant in violation of Langermann's constitutional rights; specifically, the 1st, 4th, 5th, 8th, and 14th Amendments of the U.S. Constitution.  There was no evidence in the Court records which would support its conclusions.

47.     The 4th Amendment prohibits unreasonable searches and seizures, thereby granting individuals the right to refuse entry and search without a warrant.

> Article IV of the U.S. Constitution provides:
>
> "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court's Order (*Rosner* D.E. 295) contained the following:

> "If  Mr. Langermann feels that such information request is intrusive and he will not provide it, the Court respects his feelings and his decision, but such decision on his part means that he cannot be considered for participation in the Plan nor receive any more of the funds."

The Order was contrary to the Plan of Allocation which provides:

> "Required Documentation:
>
> Applicants must provide documentation regarding income and assets; if unwilling, then assessment/home visit by a social worker will be necessary to determine need."   (*Rosner* D.E. 263)

48.     Langermann was a willing provider of documentation.

49.     Defendants, and each of them, knew that the Court's Order of March 3, 2010, was contrary to the Plan of Allocation and to the 4th Amendment of the U.S. Constitution.  Despite

this knowledge they continually demanded the illegal searches and eventually seized

Langermann's Hungarian Gold Train benefits for the year 2012, as approved by the Court's

Order of July 10, 2012.

50.    The above portion of the Order authorized the Defendants named herein to

conduct illegal, unconstitutional and unreasonable searches of Langermann's papers and

residence and also the seizure of his Hungarian Gold Train benefits under the color of law and

federal authority, which was in violation of Langermann's 4th Amendment rights under the U.S.

Constitution.  In addition, the Court's Order of March 3, 2010, provided the following

instruction:

> "More importantly, if Mr. Langermann has concerns about the actions of the
> distributing agencies, the proper procedure for him is to contact Mr. Dubbin, who
> will then undertake an investigation and endeavor to resolve the concerns."

51.    On March 9, 2010, in compliance of the Court's Order of March 3, 2010,

Langermann requested Defendant Dubbin to appeal the March 3, 2010 Order because it was in

violation of Langermann's constitutional rights and contrary to the Plan of Allocation.

52.    Defendant Dubbin, in separate letters dated March 24, 2010 and April 23, 2010,

refused to appeal the Court's Order of March 3, 2010.  This refusal constituted a contempt of the

Court's Order of March 3, 2010.

53.    At a later date, on March 1, 2012, the Honorable Judge Ursula Ungaro of the

Florida Court concluded that the March 3, 2010 Order should have been appealed, (*Rosner* D.E.

320, pg. 8), thereby confirming Defendant Dubbin's refusal to appeal was legally incorrect.

54.    On June 27, 2010, Langermann asked the Florida Court to reconsider its Order of

March 3, 2010.  The Court did not respond.

55.     On September 7, 2011, under the authority of 42 USCA §§ 1983, 1985, and "Bivens," Langermann filed a lawsuit in U.S. District Court, Southern District of Nevada, Case No. 11-01438, for the recovery of damages resulting from illegal and improper conduct of the Nevada Defendants during the periods 2006-2010.

56.     On November 23, 2011, Defendants Dubbin and Cuneo, on behalf of class members, excluding Langermann, filed a Motion in the Florida Court to Enjoin Langermann from prosecuting his Nevada action claiming that the Florida Court held jurisdiction. (*Rosner* D.E. 303)

57.     On March 1, 2012, the Florida Court granted the Motion to Enjoin Langermann from prosecuting his action in Nevada claiming that the Florida Court retained jurisdiction. (*Rosner* D.E. 320)

58.     On March 20, 2012, Langermann appealed to the 11th Circuit Court of Appeals the Florida Court's Order of March 1, 2012.

59.     On April 22, 2013, in an unpublished opinion, the 11th Circuit Court of Appeals affirmed the Florida Court's Order of March 1, 2012 (*Rosner* D.E. 320), agreeing that the Florida Court held jurisdiction over Langermann's Nevada action, while totally disregarding the fact that Langermann's Nevada lawsuit was authorized by an Act of Congress, 42 USCS §§ 1983, 1985.

60.     On June 26, 2013, The Blue Card, Inc., a defendant in the Nevada action filed a Motion in the Nevada Court to have Langermann's Nevada action dismissed with prejudice.

61.     On July 24, 2013, Langermann filed a motion in the Florida Court to allow transfer of the Nevada action to Florida. (Rosner D.E. 338)

62.    On August 8, 2013, the Florida Court instructed Langermann that the Motion to Transfer the Nevada case to Florida should be filed in the Nevada Court since it has jurisdiction. (D.E. 342)

63.    On August 12, 2013, Langermann filed, in U.S. District Court of Nevada, a Motion pursuant to 28 USCS § 1404(a) to Transfer the Nevada action to the U.S. District Court of the Southern District of Florida, in accordance with the Eleventh Circuit Court of Appeal's Opinion of April 22, 2013.

64.    On January 13, 2014, the U.S. District Court of Nevada issued an Order, **without the support of any factual or legal authority,** denying Langermann's Motion to have the Nevada case transferred to Florida, and at the same time granted The Blue Card, Inc.'s Motion to have the Nevada case dismissed with prejudice while totally disregarding the fact that the Nevada lawsuit was authorized by an Act of Congress, 42 USCS §§ 1983, 1985..

65.    On February 5, 2014, Langermann filed an appeal to the 9th Circuit Court of Appeals concerning the Nevada Court's Order of January 13, 2014, denying transfer of case and granting dismissal of case with prejudice.  This appeal is now pending.

66.    In a document entitled "Class Counsel's Status Report," dated December 31, 2009, (*Rosner* D.E. 257), Defendants Dubbin, Cuneo and Berman stated:

> "Class Counsel will advise the Court prior to the end of
> Calendar year 2010 as to their recommendations for the remaining
> funds, which will be less than $100,000."

67.    Defendants Dubbin, Cuneo and Berman intentionally failed to advise the Court concerning the disposition of the remaining funds as promised in their Status Report of December 31, 2009.  Defendants Dubbin's, Cuneo's and Berman's representations of December

31, 2009 were deliberate misrepresentations.  They intentionally concealed the amount of the funds still remaining available for distribution.

68.      Triggered by Langermann's Nevada's complaint, on July 6, 2012, eighteen months after it was due, Class Counsel filed their Status Report (*Rosner* D.E. 326) informing the Court that, in fact, there was a total of $464,533.56 comprising of accumulated interest held by the escrow agent and unused funds in possession of the Claims Conference available for distribution.

69.      Defendants Dubbin, Cuneo and Berman deliberately concealed the availability of the remaining Hungarian Gold Train settlement funds for eighteen months, thereby depriving eligible class members, including Langermann, from receiving benefits.

70.      In the July 6, 2012 Status Report, Class Counsel requested the court to authorize the disbursement of the previously undisclosed "remaining funds" of $464,533.56 between July 1, 2012 and June 30, 2013.

71.      On July 10, 2012, the Court authorized the disbursement of the remaining funds of $464,533.56 between July 1, 2012 and June 30, 2013. (D.E. 327)

72.      Of the above remaining settlement funds of $464,533.56, Defendant The Blue Card, Inc. was allocated $39,074.00 for distribution amongst Hungarian Jewish Nazi victims, including Langermann.

73.      Class members **were not notified** of the availability of these previously concealed Hungarian Gold Train Settlement funds.

74.      Langermann discovered the availability of these previously concealed Hungarian Gold Train Settlement funds without being notified by The Blue Card, Inc., or any of the other Defendants herein.

75.     Pursuant to the Court's Order of July 6, 2012, on September 6, 2012, Langermann contacted The Blue Card, Inc. requesting Hungarian Gold Train settlement funds in the amount of $1,099.00 for dental work.

76.     In a letter dated September 6, 2012, Defendant Elie Rubinstein indicated that The Blue Card, Inc. can only consider requests sent to them by the Social Service Agency, and they do not accept requests sent by individuals.  Mr. Rubinstein further reminded Langermann that in order to have a request reviewed, the home search by the local Jewish Family Service agency must be scheduled, and The Blue Card, Inc.'s form to release and obtain information must be signed.  These requests were contrary to the court approved Plan of Allocation and were designed to harass Langermann. These requests were also contrary to the manner in which The Blue Card, Inc. provided Hungarian Gold Train benefits to Langermann in 2007/2008.

77.     Defendant David C. Wrobel, First Vice President of the The Blue Card, Inc. was provided a copy of Rubinstein's September 6, 2012 letter.  Defendant Wrobel acted in concerted and adopted Defendant Rubinstein's illegal search demands and misrepresentations.

78.     The above requests by The Blue Card, Inc., Rubinstein and Wrobel were contrary and in excess of the requirements of the Plan of Allocation.

79.     On September 10, 2012, Langermann contacted each class counsel, Dubbin, Cuneo and Berman, individually for their help in facilitating the above-requested settlement funds from The Blue Card, Inc.

80.     On September 10, 2012, Langermann forwarded a relevant copy of the Plan of Allocation to Mr. Rubinstein, Executive Director of The Blue Card, Inc. and asked him to identify the specific documents he was interested in, so that they may be provided.  Mr. Rubinstein did not respond.

81.     On or around September 21, 2012, Langermann contacted Defendant Jewish Family Service Agency for help in processing his requests of September 6, 2012, for Hungarian Gold Train benefits, which were made available by the Court's Order of July 10, 2012. (*Rosner* D.E. 327)

82.     On or around September 21, 2012, Nora Kraidman of Defendant Jewish Family Agency contacted The Blue Card, Inc. to facilitate Langermann's requests for Hungarian Gold Train benefits.

83.     Class Counsel Cuneo did not respond to Langermann's requests for help of September 10, 2012, despite Class Counsel's Cuneo's obligations to do so pursuant to his representations to the court and his duties, and pursuant to the settlement agreement and final order and judgment.

84.     Additionally, during a hearing of March 17, 2005, Defendant Cuneo personally assured the Court that all three firms are committed to represent the Class and Class members during the life of the settlement. (*Rosner* D.E. 195, pg. 41)  These representations by Defendant Cuneo were blatant misrepresentations and a fraud upon the Court, class members, and Langermann and were made solely to induce reliance with no intentions to perform.

85.     In a previous letter, dated April 21, 2009, Defendant Cuneo refused to help Langermann in obtaining requested Gold Train benefits by stating: "There is nothing I can do that Mr. Dubbin is not already doing."  Defendant Cuneo acted in concert with Defendant Dubbin and aided the other Defendants herein in their illegal conduct of retaliation against Langermann.

86.     In a letter dated October 9, 2012, Defendant Dubbin by and through his attorney Nancy G. Lischter responded to Langermann's requests for help of September 10, 2012, and

under the color of law and the Court's federal authority, acting in concert with The Blue Card, Inc.'s, Rubinstein's and Wrobel's illegal search demands, in conspiracy with The Blue Card, Inc., Rubinstein and Wrobel, and in furtherance of their intent to deprive Langermann of his property interests relating to the Hungarian Gold Train Settlement funds, referred Langermann back to JFSA instead of providing the requested help. Attorney Lischter was not appointed by the Florida Court to represent Class members, including Langermann, nor was she authorized by the Court to interpret the Settlement Agreement or Plan of Allocation.

87.     On October 12, 2012, Mr. Rubinstein informed Nora Kraidman of JFSA that in order to process Langermann's request for Hungarian Gold Train benefits, a home search would have to be performed by JFSA and a release of information signed by Langermann; and even then, the committee may not grant the requested assistance. These demands were in excess and contrary to the requirements of the court approved Plan of Allocation and were designed to harass and retaliate against Langermann.

88.     On October 22, 2012, Langermann once again contacted Defendant Dubbin for his assistance in facilitating Langermann's request for Hungarian Gold Train benefits pursuant to the Florida Court's Order of July 10, 2012. (*Rosner* D.E. 327)

89.     In a letter dated October 25, 2012, in response to Langermann's October 22, 2012 requests, once again Defendant Dubbin, by and through his attorney Nancy G. Lischter, under the color of law and federal authority, and in concert with The Blue Card, Inc.'s, Rubinstein's and Wrobel's illegal search demands, and in contempt of the court's order of March 3, 2010, refused to provide any further assistance to Langermann concerning 2012 Hungarian Gold Train benefit requests, as afforded by the Florida Court's Order of July 10, 2012.

90.     On November 5, 2012, Nora Kraidman of JFSA contacted Langermann advising him that she was instructed by Christina Primac, executive secretary of JFSA, to suspend any further service to Langermann, due to the lawsuit filed by him in Nevada in September 2011 naming JFSA as a defendant. JFSA retaliated against Langermann for exercising his First Amendment right to petition the court for redress of grievances and for engaging in a federally protected activity.

91.     On November 26, 2012, Mr. Leonard Stone, attorney for JFSA contacted Langermann, threatening to withhold further assistance by JFSA concerning current Hungarian Gold Train benefits unless Langermann dismissed JFSA from the Nevada lawsuit filed in September 2011. JFSA retaliated against Langermann for exercising his First Amendment right to petition the court for redress of grievances and for engaging in a federally protected activity.

92.     On November 27, 2012, Defendant Berman responded to Langermann's September 10, 2012, requests for help, and under the color law and federal authority, and in concert with Defendant Dubbin, Defendant Berman adopted Defendant Dubbin's incorrect conclusions that Langermann should comply with The Blue Card, Inc.'s illegal search demands. Defendant Berman also failed to provide any assistance to Langermann as required by the Settlement Agreement and Class Counsel's promises that all three firms will provide service to the class and individual class members during the life of the settlement.

93.     On December 10, 2012, Langermann once again contacted Defendant Berman for his assistance in facilitating current requests for Hungarian Gold Train benefits. Attorney Berman did not respond. By failing to respond, Defendant Berman has breached his duty to assist Langermann as otherwise required by the Settlement Agreement and Final Order and Judgment and by the various promises of Class Counsel as alleged herein.

21

94.     On January 28, 2013, Mr. Leonard Stone, attorney for JFSA, once again called Langermann, threatening to withhold further assistance by JFSA concerning current Hungarian Gold Train benefits unless Langermann dismissed JFSA from the Nevada lawsuit filed in September 2011.  JFSA retaliated against Langermann for exercising his 1st Amendment right to petition the court for redress of grievances and for engaging in a federally protected activity.

95.     Langermann did not receive the September 6, 2012, requested Hungarian Gold Train settlement funds which were made available by the Court's Order of July 10, 2012.  The Blue Card, Inc. seized Langermann's benefits under the color of law and federal authority and in violation of his 4th and 5th Amendment rights under the U.S. Constitution.

96.     At all material times and in acting as alleged herein, Defendants and each of them, knew that Langermann was entitled to and relying on the financial assistance from the Hungarian Gold Train settlement benefits as afforded by the Settlement Order and the Court approved Plan of Allocation. Notwithstanding such knowledge and acting oppressively and maliciously toward Langermann, with a conscious disregard of his own rights, with the intention of causing or recklessly disregarding the probability of causing injury and emotional distress to Langermann, requiring medical attention.  Defendants and each of them, under the color of law and federal authority, have conspired and engaged in the deprivation of Langermann's Constitutional and federally protected rights, deprived Langermann of Hungarian Gold Train benefits, and engaged in various tortuous conduct as alleged herein, including civil rights and statutory violations, fraud, misrepresentation, negligent hiring, negligent supervision and supervisory responsibility, willful and deliberate retaliation, breach of fiduciary duty, tortuous interference with a protected property interest, civil conspiracy, breach of trust, embezzlement and misappropriation of funds, bad faith, intentional infliction of emotional distress, and professional malpractice.  In so acting,

22

Defendants, and each of them, intended to and did vex, annoy, injure and harass Langermann so as to justify the assessment of punitive and exemplary damages against defendants and each of them.

**First Cause of Action**
**(42 USC § 1983 - Bivens Action**
**Civil action for deprivation of rights)**

97.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 96 as though fully set forth herein and further alleges as follows:

98.     This claim for relief is brought pursuant to 'Bivens' for violations of Langermann's rights under the 4th and 5th Amendments of the United States Constitution when Defendants used unlawful force in seizing Langermann's Gold Train benefits.  This claim for relief is to redress a deprivation, under color of authority, secured to Langermann by the 4th, 5th, and 14th Amendments to the United States Constitution.

99.     During all times mentioned herein, Defendants, and each of them, acted under the color of law and pretense of federal authority.

100.    At all relevant times, Langermann had the right under the 4th Amendment to be free from unreasonable searches and seizures of his person, home, papers and effects without probable cause, under the color of law, and federal authority, by Defendants, and each of them.

101.    At all relevant times, Langermann possessed the rights guaranteed by the 5th Amendment to not be deprived of life, liberty, and property without due process of law, including but not limited to the right not to suffer harm from persons acting under the color of law and federal authority that is intentionally or wantonly inflicted or which is accomplished with deliberate, reckless, or callous indifference to his constitutional rights.

102.    At all relevant times, Langermann had rights guaranteed by the Equal Protection Clause and the Due Process Clause of the 5th Amendment to the United States Constitution.

103.    At all relevant times, while acting under color of law and federal authority, as officers and agents of the court, Defendants, and each of them, intentionally deprived Langermann of his 4th Amendment right to be free from unreasonable searches and seizures by subjecting him to the forceful seizing of his Hungarian Gold Train benefits which were made available by the Florida Court's Order of July 10, 2012. (*Rosner* D.E. 327)

104.    At all relevant times, while acting under color of law and federal authority, as officers and agents of the Court, Defendants and each of them, intentionally violated Langermann's rights guaranteed by the 5th Amendment to not be deprived of life, liberty, and property without Due Process of Law, including but not limited to the right not to suffer the loss of property from persons acting under color of law and federal authority that is intentionally or wantonly inflicted or which is accomplished with deliberate, reckless, or callous indifference to his constitutional rights.

105.    While acting under color of federal law and federal authority as officers and agents of the court, Defendants, and each of them, were motivated by evil intent and conduct in which they engaged in by use of excessive force in seizing Langermann's Hungarian Gold Train benefits, and this conduct showed reckless or callous indifference to his Constitutional rights.

106.    Defendants, and each of them, by using such unreasonable force, caused injury and damage to Langermann, ultimately resulting in harm.

107.    At all relevant times, Langermann complied with the court approved Plan of Allocation.

24

108.    The forceful seizure of Langermann's Hungarian Gold Train benefits by Defendants, and each of them, was entirely unjustified by any action of Langermann, and said seizure constituted an unreasonable and excessive use of force in violation of Langermann's guaranteed rights under the 4th, 5th, and 14th Amendments of the United States Constitution, which protects persons from unreasonable searches and seizures and deprivation of property.

109.    Defendants, and each of them, acted specifically with the intent to deprive Langermann of the following rights and privileges guaranteed under the United States Constitution:

    1)      freedom from unreasonable seizures, in the form of the use of excessive force;

    2)      freedom from a deprivation of liberty and property without due process of law;

    3)      and equal protection of the laws.

110.    After being deprived of benefits multiple times, Langermann suffered severe physical, emotional, and psychological damage as a result of the conduct of Defendants, and each of them. Defendants, and each of them, subjected Langermann to the aforementioned deprivations by either actual malice or deliberate indifference and disregard of Langermann's civil rights.

111.    As a direct and proximate result of the aforementioned acts of Defendants, and each of them, Langermann suffered general damages in the form of conscious pain and suffering, the loss of the enjoyment of life, economic support, for which Langermann seeks compensatory damages against Defendants, and each of them.

112.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

113.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this first cause of action in their individual/corporate capacities.

### Second Cause of Action
### (42 USC § 1985 Conspiracy to interfere with civil rights)

114.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 113 as though fully set forth herein and further alleges as follows:

115.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, JFSA and/or Does and Roes conspired, (l) for the purpose of interfering with Langermann's civil rights as afforded by the 4th Amendment of the United States Constitution to be free of unreasonable searches and seizures; (2) 5th Amendment of U.S. Constitution to be free of deprivation of life, liberty and property without due process of law; (3) for the purpose of impeding, hindering, obstructing and/or defeating the course of justice; (4) for the purpose of depriving Langermann directly and/or indirectly of the equal protection of the laws and of equal privileges and immunities under the laws, as alleged herein; all with the intent to deprive Langermann of Due Process and Hungarian Gold Train benefits which were provided by the United States of America.

116.    Langermann belongs to the following classes of protected people: (l) "Class of One" as Langermann was treated differently than other class members of the underlying case; (2) "Older American" as Congress has indicated through legislation that Older Americans require special protection, 42 USC §3001 et seq.; and (3) "Pro Se Litigant," the 1st, 5th, and 14th Amendments of the U.S. Constitution guarantee equal protection. Congress further indicated

through legislation that "Pro Se" litigants require special protection by enacting 28 USC §1654, which provides "...parties may...conduct their own cases personally..."

117.    As a result of the conspiracy, Defendants obstructed justice and interfered with Langermann's civil rights. As a result of the above-described actions, as alleged herein, Langermann's civil rights were violated, his Hungarian Gold Train benefits were seized without probable cause, and suffered damages.

118.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

119.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Second Cause of Action in their individual/corporate capacities.

**Third Cause of Action**
**(Retaliation)**

120.    Plaintiff repeats and realleges each and every allegation contained in  paragraphs 1  through 119 as  though  fully set forth herein and further alleges as follows:

121.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, deliberately **retaliated** against Langermann for his persistence in exercising his rights to Hungarian Gold Train Benefits, for exercising his right to be free of unreasonable searches, for exercising his constitutional rights under the 1st, 4th, 5th, and 14th Amendments of the U.S. Constitutional to petition the government for redress of grievances, to petition the various state bars for redress for his grievances, and to be free of the deprivation of life, liberty and property.

122.     Plaintiff's federally protected activities were a substantial or motivating factor

behind the adverse actions of Defendants, and each of them, including the unreasonable search

demands and the seizure of his Hungarian Gold Train benefits, as authorized by the Florida

Court's Order of July 10, 2012.

123.     As a result of the above-actions, Plaintiff suffered damages.

124.     Defendants' acts were willful and oppressive and malicious so as to justify an

award of punitive damages.

125.     Plaintiff requests that this Honorable Court award compensatory and punitive

damages in an amount to be determined according to proof by Plaintiff and against all

Defendants named in this Third Cause of Action in their individual/corporate capacities.

**Fourth Cause of Action**
**(Violation of 18 USC § 241)**

126.     Plaintiff  repeats and realleges each and every  allegation contained in  paragraphs

1  through 125 as  though  fully set forth herein and further alleges as follows:

> 18 USC § 241 regarding conspiracy against rights states in pertinent part,
> If any person in any State...in the free exercise or enjoyment of any
> right or privilege secured to him by the Constitution or laws of the
> United States, or because of his having so exercised the same....
> they shall be fined under this title or imprisoned not more than ten
> years, or both...

127.     Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc.,

JFSA and/or Does and Roes conspired to oppress, threaten and intimidate Langermann in the

free exercise and enjoyment of his right to due process and the equal protection of the law

guaranteed by the 1st, 4th, 5th and 14th Amendments of the U.S. Constitution because Langermann

petitioned the government for redress of grievances and reported Defendants Dubbin, Cuneo and

Berman to the various State Bars.  Defendants did so by threats and actions to seize

Langermann's Hungarian Gold Train benefits in violation of 18 USC § 241.

128.     Defendants' acts were willful and oppressive and malicious so as to justify an

award of punitive damages.

129.     Plaintiff requests that this Honorable Court award compensatory and punitive

damages in an amount to be determined according to proof by Plaintiff against all Defendants

named in this Fourth Cause of Action in their individual/corporate capacities.

**Fifth Cause of Action**
**(Violation of 18 USC § 242)**

130.     Plaintiff  repeats and realleges each and every allegation contained in  paragraphs

1  through 129 as  though  fully set forth herein and further alleges as follows:

> 18 USC § 242 regarding Deprivation of Rights under color of law states in
> pertinent part:

> "Whoever, under color  of any law, statute, ordinance,  regulation, or custom,
> willfully subjects any person in any State…to the deprivation of any rights,
> privileges or immunities secured or protected by the Constitution or laws of the
> United  States...shall be fined under this title or imprisoned nor more than ten
> years or both…"

131.     Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc.,

JFSA and/Does and Roes continuous search demands of Langermann's papers and residence, as

well as the eventual seizure of his Hungarian Gold Train benefits of 2012as authorized by the

Florida Court's Order of July 10, 2012, (*Rosner* D.E. 327)) was done under the color of law and

federal authority, but without a warrant, without probable cause and without the support of Oath

or affirmation, contrary to the commands of the 4th Amendment of the U.S. Constitution.

Langermann's right was clearly established by the 4th Amendment of the U.S. Constitution to be

free of unreasonable searches and seizures without a warrant and by the 5th Amendment to be

free of the deprivation of life, liberty and property without due process of law.  Defendants, and each of them, violated Langermann's constitutional rights.  Langermann had a right to refuse an unconstitutional act.  The eventual seizure of Langermann's Hungarian Gold Train benefits were in violation of his 4th Amendment rights which prohibit unreasonable searches and seizures and requires a warrant and probable cause and 5th Amendment rights which prohibits deprivation of life, liberty and property without due process of law.

132.    As a direct and proximate result of Defendants' conduct, Langermann has suffered and will continue to suffer damages, including economic and compensatory damages in an amount according to proof.

133.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

134.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Fifth Cause of Action in their individual/corporate capacities.

### Sixth Cause of Action
### Violation of 18 USC § 245
### (Violation of Federally Protected Activities)

135.    Plaintiff  repeats and realleges each and every  allegation contained in  paragraphs 1  through 134 as  though  fully set forth herein and further alleges as follows:

18 USC §245 regarding federally protected activities states in pertinent part:

****

(b)  Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with or attempts   to injure, intimidate or interfere with -

(1)  any person because he is or has been, or in order to intimidate such person or any other person…from…

30

\*\*\*\*

(B) participating in or enjoying any benefit...program...provided...by the United States...

(E) participating in or enjoying the benefits of any program or activity receiving Federal financial assistance...

shall be fined under this title, or imprisoned not more than one year or both...

136.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, acting under color of law and federal authority, by threat of deprivation, willfully intimidated, interfered with and attempted to intimidate and interfere with Langermann enjoying the benefits of Hungarian Gold Train settlement, which were derived from funds provided by the United States.  Defendants eventually seized Langermann's Hungarian Gold Train benefits which were provided by the United States of America, and made available by the Florida Court's Order of July 10, 2012.

137.    As a direct and proximate result of Defendants' conduct, Langermann has suffered and will continue to suffer damages, including economic and compensatory damages in an amount according to proof.

138.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

139.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Sixth Cause of Action in their individual/corporate capacities.

### Seventh Cause of Action
### (Civil Conspiracy)

140.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1  through 139 as though fully set forth herein and further alleges as follows:

141.    At all times relevant herein, Langermann had the above described rights and interests to receive benefits under the Hungarian Gold Train Settlement.  Langermann also had a federally protected right to be free of unreasonable and warrantless searches and seizures, a right to petition the government for redress of grievances, and the right to be free of the deprivation of life, liberty and property.

142.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, in concert (i) formed a common plan and design to deprive Langermann out of his legitimate rights and interests under the Hungarian Gold Train Settlement through the fraudulent course of conduct and (ii) actively participated  in, aided, abetted, ratified and adopted for their own improper purposes the actions in furtherance of the conspiracy.

143.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, engaged in the conspiracy with a malicious intent to harm Langermann.

144.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, utilized unlawful means to accomplish the goal of the conspiracy, including the involvement of the Court.

145.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA and/or Does and Roes utilized the force of the number of members of the conspiracy as well as the vastly superior financial resources of the conspirators to commit the conspiracy.

146.    As a direct and proximate result of such misconduct, Langermann has suffered damages in an amount to be determined according to proof, which damages will continue to increase and accrue with the passage of time until trial and payment thereof.

147.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

148.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff and against all Defendants named in this Seventh Cause of Action in their individual/corporate capacities.

**Eighth Cause of Action**
**(Intentional interference with Plaintiff's Prospective**
**Economic Advantage and Conspiracy)**

149.    Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 148 as though fully set forth herein and further alleges as follows:

150.    At all times relevant herein, Langermann was a class member, and properly entitled to receive benefits under the Hungarian Gold Train Settlement and the Court approved Plan of Allocation, and the Court's Order of July 10, 2012, which were valid and binding judicially imposed documents.

151.    At all material times and in doing the things alleged herein, Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, all knew that Langermann was relying on the financial assistance from the Hungarian Gold Train Settlement benefits as afforded by the Settlement Order, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012, and had a protected property interest in such benefits. Nevertheless, Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes interfered with and disrupted such protected property interests of Langermann, as described throughout this complaint.

152.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA and/or Does and Roes each (i) had full knowledge of the existence of Langermann's

33

entitlements under the Hungarian Gold Train Settlement, the Court approved Plan of Allocation, the Court's Order of July 10, 2012, and (ii) knowingly, intentionally, willfully and unlawfully helped, plan, develop and implement the impairment, disruption and destruction of Langermann's rights to Hungarian Gold Train benefits, through the fraudulent course of conduct, including especially but without limitation the cover-up and retaliation.

153.    Such misconduct impaired, disrupted and destroyed Langermann's rights to Hungarian Gold Train benefits.

154.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, in concert (i) formed a common plan and design to defraud Langermann out of his legitimate rights and interests under the Hungarian Gold Train settlement, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012; and (ii) actively participated in, aided, abetted, ratified, and adopted for their improper purposes, in furtherance of this conspiracy, all with a malicious intent to harm Langermann, by unlawful means to accomplish the goal of the conspiracy, utilizing the force of the number of members of their conspiracy as well as their vastly superior financial resources.

155.    As a direct and proximate result of such misconduct, Langermann has suffered damages in an amount to be determined according to proof, which damages will continue to increase and accrue with the passage of time until trial and payment thereof.

156.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

157.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff and against all Defendants named in this Eighth Cause of Action in their individual/corporate capacities.

### Ninth Cause of Action
### (Breach of Trust)

158.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 157 as though fully set forth herein and further alleges as follows:

159.    The Blue Card, Inc. was entrusted with the distribution of Settlement Funds.  The Blue Card, Inc. agreed to distribute said funds amongst beneficiaries, including Langermann, in accordance with the Settlement Agreement, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012.  The Blue Card, Inc. has repeatedly breached the trust by conduct including but not limited to failing to adequately account and report; breaching the duty of loyalty and impartiality; making inequitable distributions to target harm Langermann; engaging in bad faith and reckless indifference to the interests of Langermann; engaging in self-interest and self-dealing, failing to abide by the Settlement Order and Plan of Allocation; making repeated false statements and misrepresentations to impair the interests of Langermann; interfering in the private affairs of Langermann as an intimidation tactic; made extortionistic demands; and failed to make proper allocations and engaged in abusive and exploitatious conduct.

160.    The Blue Card, Inc. has obtained the Settlement funds belonging to beneficiaries, including Langermann, through deception.

161.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

162.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff and against all Defendants named in this Ninth Cause of Action in their individual/corporate capacities.

### Tenth Cause of Action
### (Legal Malpractice)

163.    Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 162 as though fully set forth herein and further alleges as follows:

164.    Defendants Dubbin, Cuneo and Berman acted as lead attorneys on behalf of Plaintiffs and all class members including Langermann, in the underlying "Hungarian Gold Train" case. (*Rosner v. USA*, Case No. 1:01-cv-01859-PAS, United States District Court, Southern District of Florida)  Defendants Dubbin, Cuneo and Berman were licensed attorneys at all relevant times.

165.    Defendants Dubbin, Cuneo and Berman requested and were awarded by the Court, and paid from the Settlement Funds, every penny they requested for Attorneys' fees and costs in the amount of $3.8 million partially based on their promises of implementation and ongoing involvement over the next several years and as required by the Final Order and Judgment.

166.    Langermann is an intended beneficiary of the legal services rendered by Defendants Dubbin, Cuneo and Berman, and there was foreseeable harm to Langermann from their professional negligence.

167.    Defendants Dubbin, Cuneo and Berman assumed the position and authority as lead counsel, to oversee the implementation of the Settlement Agreement, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012, for the benefit of the beneficiaries, including Langermann.  Defendants  Dubbin, Cuneo and Berman assumed a position of trust and confidence with respect to the beneficiaries, including Langermann, and the distribution of the Settlement Funds.

168.     Defendants Dubbin's, Cuneo's and Berman's conduct was intended to adversely impact Langermann's interests in receiving benefits from the Settlement funds. Also, it was certain that there would be harm to Langermann immediately and that such harm would continue into the future.

169.     Defendants Dubbin, Cuneo and Berman were aware that appropriate action and corrections were necessary to prevent or rectify the improper actions of Defendants The Blue Card, Inc., JFSA, Rubinstein, Wrobel, and/or Does and Roes, resulting in the illegal seizure of Langermann's Hungarian Gold Train benefits which were made available pursuant to the Court's Order of July 10, 2012.

170.     Defendants Dubbin, Cuneo and Berman have benefited personally in conspiring with The Blue Card, Inc., JFSA, Rubinstein and Wrobel in depriving Langermann of Hungarian Gold Train benefits.

171.     Defendants Dubbin, Cuneo and Berman have made numerous misrepresentations of material fact in multiple court proceedings, as well as in numerous written and verbal communications with Langermann, and they intended to induce reliance on their representations.

172.     Additionally, Defendants Dubbin, Cuneo, and Berman have concealed or suppressed material facts from the Court and Langermann, which caused substantial harm to Langermann, as well as other beneficiaries.

173.     Defendants Dubbin, Cuneo and Berman have failed to timely appeal the Court's Order of March 3, 2010, failed to represent Langermann with undivided loyalty, and failed to communicate with Langermann.

174.     Defendants Dubbin, Cuneo and Berman embezzled and/or misappropriated settlement funds, and/or were otherwise involved in the misappropriation of settlement funds.

175.     Defendants Dubbin, Cuneo and Berman have conspired with the other defendants in this case, and engaged in the deprivation of Langermann's constitutional and federally protected rights, as well as his Hungarian Gold Train benefits.

176.     Defendants Dubbin, Cuneo and Berman have failed to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake thereby causing damage to Langermann.

177.     At all times, Defendants Dubbin, Cuneo and Berman had a duty to use such skill and prudence as members of the legal profession, but they breached this duty.

178.     As a direct and proximate result of Defendants Dubbin, Cuneo and Berman's conduct, Plaintiff has suffered and will continue to suffer damages including economic and compensatory in an amount according to proof.

179.     Defendants Dubbin's, Cuneo's and Berman's acts were willful and oppressive so as to justify an award of punitive damages according to proof.

180.     Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants Dubbin, Cuneo and Berman named in this Tenth Cause of Action in their individual/corporate capacities.

**Eleventh Cause of Action**
**(Breach of Fiduciary Duty)**

181.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 180 as though fully set forth herein and further alleges as follows:

182.     Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, all claimed to act on behalf of the Hungarian Gold Train settlement or took actions as attorneys or fiduciaries with respect to the Hungarian Gold Train settlement and Court approved Plan of Allocation and its beneficiaries, including Langermann.

183.     Defendants Dubbin, Cuneo and Berman, acted as lead attorneys entrusted with implementing the Settlement Order, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012.  Defendants, and each of them, were entrusted with distribution of the Settlement funds to beneficiaries, and JFSA was entrusted with determining qualifications and entitlements of beneficiaries.  There was a foreseeable harm to beneficiaries, including Langermann, from these Defendants' breach of fiduciary duties.  In that regard (a) the conduct of these Defendants was intended to adversely impact Langermann's  interests in the distribution of the settlement funds and it was foreseeable that their conduct would affect Langermann's interests in the distribution of the settlement funds.  Also, it was certain that there would be harm to Langermann immediately and that such harm would continue into the future;  (b) Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, were aware that appropriate action and corrections were necessary to prevent or rectify a breach of fiduciary duty and that they had obligations to correct the breach, fraud and misrepresentations made during the distribution of the settlement  funds; and (c) Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., and JFSA, have made misrepresentations in multiple written and verbal communications.  Defendants  Dubbin, Cuneo and Berman also made misrepresentations in court proceedings, and they all intended to induce reliance on their representations.  Additionally, Defendants, and each of them, concealed or

suppressed material facts from Langermann, all of which caused substantial harm to Langermann.

184.    As alleged herein, Dubbin, Cuneo and Berman have made numerous broken promises, requested and accepted professional fees for services which they failed and refused to perform; made numerous misrepresentations concerning the availability of funds, the settlement order, the Plan of Allocation; have conspired against their own client to deprive him of Hungarian Gold Train benefits and his constitutional rights; and misappropriated Settlement Funds.  Defendants Dubbin's, Cuneo's and Berman's conduct was deliberate, malicious, and so extreme and outrageous, it went beyond the bounds of all human decency.   Defendants Dubbin, Cuneo and Berman have all breached their fiduciary duty owed to Langermann.

185.    The Blue Card, Inc. was designated by the "Claims Conference," as approved by the Court and class counsel, to distribute Hungarian Gold Train funds to various class members, including Langermann.  The Blue Card, Inc. has accepted that responsibility.

186.    JFSA was designated by the "Claim Conference" to coordinate claims between class members, including Langermann, and the distributing agencies.  JFSA has accepted that responsibility.  The relationship between JFSA and Langermann was of a fiduciary nature.  JFSA owed Langermann a fiduciary duty to coordinate his claims in accordance with the Settlement Order and Court approved Plan of Allocation.  As alleged throughout this complaint, on the specific dates and instances, by their conduct JFSA breached its fiduciary duty owed to Langermann.

187.    Defendants Rubinstein and Wrobel were executives of The Blue Card, Inc.

188.    The relationship between The Blue Card, Inc., Rubinstein, Wrobel and Langermann was of a fiduciary nature.  The Blue Card, Inc., Rubinstein and Wrobel owed

Langermann a fiduciary duty to handle all Gold Train funds in accordance with the Settlement Order and the Court approved Plan of Allocation. As alleged throughout this complaint, on the specific dates and instances, by their conduct, The Blue Card, Inc., Rubinstein and Wrobel have breached its fiduciary duty owed to Langermann.

189.    Defendants Dubbin, Berman and Cuneo owed Class members, including Langermann, a duty of care to ensure that class members receive all the benefits afforded in accordance with the Settlement Order, the Court approved Plan of Allocation, and the Court's Order of July 10, 2012.   This overall duty of care encompassed a duty to supervise the conduct of all distributing agencies and social workers, and to enforce and implement the terms of the Settlement Order and Court approved Plan of Allocation; and to take appropriate measures to protect class members including Langermann, from abuse, exploitation and violations of their Constitutional rights. Encompassed within Defendants Dubbin's, Cuneo's and Berman's duty to protect class members, including Langermann, was a duty to exercise due care in investigating Langermann's complaints of mistreatment by The Blue Card, Inc. and JFSA: 1.) to take reasonable steps to protect Langermann from abuse, exploitation and extortionistic demands; 2.) to take prompt and appropriate action to protect Langermann from further harassment; 3.) to remove The Blue Card, Inc. and JFSA from the Plan of Allocation; 4.) and to provide accurate accounting of the Settlement Funds.  Defendants Dubbin, Cuneo and Berman owed every duty alleged in this paragraph to Langermann.  Dubbin, Cuneo and Berman have breached their fiduciary duties owed to all class members, including Langermann.

190.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, under the color of law and federal authority, have conspired and

engaged in the deprivation of Langermann's constitutional and federally protected rights, as well as his Hungarian Gold Train Benefits.

191.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, JFSA, and/or Does and Roes, have breached their fiduciary duties owed and assumed on behalf of the Hungarian Gold Train Settlement Order and Court approved Plan of Allocation and with respect to the interests of the beneficiaries including Langermann.

192.    As a direct and proximate result of the Defendants' conduct, Langermann has suffered damages and will continue to suffer damages, including economic and compensatory in an amount according to proof.

193.    Defendants' acts were willful and oppressive so as to justify an award of punitive damages according to proof.

194.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Eleventh Cause of Action in their individual/corporate capacities.

**Twelfth Cause of Action**
**(Fraud Against Defendants Dubbin, Cuneo, Berman,**
**Rubinstein, Wrobel, and The Blue Card, Inc.)**

195.    Plaintiff  repeats and realleges each and every allegation contained  in paragraphs 1 through 194 as though fully set forth herein and further alleges as follows:

196.    Defendants concealed material facts and misrepresented material facts and failed to disclose material facts relating to the Hungarian Gold Train Settlement Order and Court Approved Plan of Allocation concerning the distribution of the Settlement Funds:

(i)      On March 17, 2005, during a court hearing, Defendants Dubbin, Cuneo and Berman blatantly misrepresented to the court their ongoing commitment to the class and individual class members during the life of the settlement (*Rosner* D.E. 195);

(ii)     On June 17, 2005, Defendants Dubbin, Cuneo and Berman, in their applications for attorneys' fees (*Rosner* D.E. 212) misrepresented their ongoing commitment to assist class members in implementing the Settlement Agreement over the next several years;

(iii)    Between December 31, 2010 and July 6,  2012, Defendants Dubbin, Cuneo and Berman concealed the availability of the remaining Settlement funds;

(iv)     On and after July 10, 2012, Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, and The Blue Card, Inc. fraudulently concealed from class members the availability of $464.553.56 settlement funds ordered by the court for distribution on July 10, 2012;

(v)      On September 6, 2012, in a letter, Defendants Rubinstein and Wrobel misrepresented requirements of the Court approved Plan of Allocation;

(vi)     On October 9, 2012, in a letter, Defendant Dubbin misrepresented requirements of the Court approved Plan of Allocation;

(vii)    On October 25, 2012, in a letter, Defendant Dubbin misrepresented his duties as class counsel and refused to take any action on behalf of Langermann contrary to his prior promises and duties pursuant to the Settlement Agreement and in contempt of the Court's Order of March 3, 2010;

(viii)   On November 7, 2012, Defendant Berman misrepresented requirements of the Court approved Plan of Allocation.

197.   The representations made by Defendants were false and misleading and Defendants knew they were false and misleading and/or made the representations recklessly without regard to their truth or falsity. The representations were made to deprive Langermann of Hungarian Gold Train benefits and to deprive Langermann of his federally protected civil rights.

198.   Defendants made the representations with the intent to defraud and mislead Langermann and the court, to benefit themselves and others, and/or for the purpose of inducing Langermann and the court to rely on Defendants' representations or to act or to refrain from acting in reliance on those representations, and to perpetuate economic hardship and distress to Langermann.

199.   As a direct and proximate result of Defendants' conduct, Langermann has suffered and will continue to suffer damages, including economic and compensatory in an amount according to proof.

200.   Defendants' acts were willful and oppressive and justify an award of punitive damages.

201.   Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Twelfth Cause of action in their individual/corporate capacities.

### Thirteenth Cause of Action
### (Conversion)

202.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 201 as though fully set forth herein and further alleges as follows:

44

203.    Langermann owned or had a right to possession and access to benefits derived from the Hungarian Gold Train Settlement Funds.

204.    Defendants Dubbin Cuneo and Berman, in their capacities as lead counsel, had control over the allocation of the settlement funds, had a duty to implement the Settlement Order and Court approved Plan of Allocation, and distribution of Settlement funds by the Court's Order of July 10, 2012.

205.    On December 31, 2009, Defendants Dubbin, Cuneo and Berman filed a document entitled "Class Counsel's Status Report," (*Rosner* D.E. 289). In that report, Defendants Dubbin, Cuneo and Berman indicated that they will advise the court prior to the end of calendar year 2010 as to their recommendations as to any remaining funds which will be less than $100,000.

206.    Defendants Dubbin, Cuneo and Berman did not advise the Court concerning the disposition of the remaining funds on the promised date.

207.    On September 7, 2011, Langermann filed a Complaint in the U.S. District Court, Nevada, at which time Langermann alleged Defendants' failure to account for the remaining $100,000 settlement funds.

208.    Langermann's Nevada lawsuit triggered Defendants Dubbin, Cuneo and Berman to disclose the availability of the previously concealed Settlement funds which totaled $464,533.56 and not the $100,000 previously indicated by Class Counsel Dubbin, Cuneo and Berman.

209.    On July 6, 2012, in a document entitled "Class Counsel's Status Report," (*Rosner* D.E. 326), Defendants Dubbin, Cuneo, and Berman moved the Court for an order authorizing the disbursement of the newly discovered previously concealed funds totaling **$464.533.56** to fund

emergency assisted support for Hungarian Holocaust survivors between July 1, 2012 and June 30, 2013.

210.    The Blue Card, Inc., in its capacity as a fiduciary had and received for the use of eligible class member beneficiaries, including Langermann, certain allocated settlement funds, during the calendar years of 2012/2013 in the amount of $39,074.00.

211.    Langermann has applied to the Blue Card, Inc., either directly or through JFSA, for Hungarian Gold Train benefits in the year 2012 in the amount of $1099.00.   This amount though requested has never been paid over or delivered to Langermann, but has been wrongfully and in violation of the Blue Card's trust, converted by The Blue Card, Inc., for its own or other use.

212.    Langermann did not consent to this conduct and was harmed by this conduct. Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, actions were a substantial factor in the conversion of the requested Hungarian Gold Train Settlement funds and the subsequent harm suffered by Langermann.

213.    As a direct and proximate result of Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes conduct, Langermann has suffered and will continue to suffer damages, including economic and compensatory in an amount according to proof.

214.    Defendants acts were willful, oppressive, and malicious so as to justify an award of punitive damages.

215.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Thirteenth Cause of Action in their individual/corporate capacities.

## Fourteenth Cause of Action
### (Negligent Hiring)

216.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1   through 215 as though fully set forth herein and alleges as follows:

217.     The Blue Card, Inc. was at all relevant times to this complaint the employer of Elie Rubinstein, David C. Wrobel, and all other individuals involved in the processing of Langermann's Hungarian Gold Train benefits, and whose identities are not known to Langermann at this time.

218.     JFSA at all relevant times to this complaint was the employer of Nora Kraidman, Kristina Primac, and Leonard Stone, and all other individuals involved in the processing of Langermann's Hungarian Gold Train benefits, and whose identities are not known to Langermann at this time.

219.     Both The Blue Card, Inc. and JFSA knew or should have known that none of the above referred to individuals had knowledge of the requirements set forth in the Settlement Order and the Court approved Plan of Allocation concerning Hungarian Gold Train benefits.

220.     Both The Blue Card, Inc. and JFSA had a duty of reasonable care owed to Langermann to hire competent, qualified and licensed employees.

221.     Both The Blue Card, Inc. and JFSA breached their duty of reasonable care by hiring employees who were incompetent, unfit, unqualified, and insensitive towards beneficiaries, including Langermann.

222.     The failure of The Blue Card, Inc. and JFSA to exercise reasonable care was a proximate cause of the injuries and loss suffered by Langermann.

223.    The Blue Card's and JFSA's acts were willful and oppressive, so as to justify an award of punitive damages according to proof.

224.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Fourteenth Cause of Action in their individual/corporate capacities.

### Fifteenth Cause of Action
### (Negligent Supervision)

225.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 224 as though fully set forth herein and further alleges as follows:

226.    At all relevant times hereto, neither The Blue Card, Inc. or JFSA maintained employee manuals or any documentation concerning the Hungarian Gold Train Settlement Order and Court approved Plan of Allocation.  Neither The Blue Card, Inc. or JFSA provided reasonable training of their employees concerning the distribution of Hungarian Gold Train Settlement Funds.  Both The Blue Card, Inc. and JFSA had a duty to supervise their employees when dealing with Hungarian Gold Train beneficiaries.  Specifically both The Blue Card, Inc. and JFSA had a duty to Langermann to supervise their employees to insure that Langermann is protected from injury that these employees committed on Langermann as described in this complaint.

227.    The Blue Card, Inc. and JFSA had both breached their duty of supervision over their employees by not supervising them adequately as described above.

228.    The Blue Card's and JFSA's breach of their supervisory duty to Langermann was a proximate cause of the injury and loss suffered by Langermann.

229.    The Blue Card's and JFSA's acts were willful and oppressive so as to justify an award of punitive damages according to proof.

230.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Fifteenth Cause of Action in their individual/corporate capacities.

### Sixteenth Cause of Action
### (Supervisorial Responsibility For Violations of Civil Rights Under Color of Law)
### (Bivens Action)

231.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 230 as though fully set forth herein and further alleges as follows:

232.    This claim for relief is brought pursuant to Bivens for violations of Langermann's rights under the 4th and 5th Amendments of the United States Constitution.

233.    At all relevant times, unknown Supervisory Personnel of Defendants The Blue Card, Inc. and JFSA implemented and maintained customs, policies, and/or practices to encourage the use of excessive force by intimidation, retaliation, and other constitutional violations by subordinates.  Unknown Supervisory Personnel intentionally, deliberately, and/or were indifferent to the violation of the constitutional rights of beneficiaries in the same situation as and including Langermann.

234.    At all relevant times, unknown Supervisory Personnel were supervising subordinates, with supervisory authority over the subordinates, and participated in, encouraged, fostered, condoned, and ratified the conduct of the subordinates when the subordinates used unlawful injurious force in retaliation and seizure of Langermann's Hungarian Gold Train benefits even though their conduct was contrary to the Court approved Plan of Allocation as well as the laws and constitution of the United States of America.

235.    As a direct and proximate result of the Unknown Supervisory Personnel's intentional, deliberate, and/or indifference to the use of excessive force, intimidation and retaliation, by subordinates, Langermann's Hungarian Gold Train benefits pursuant to the Court's Order of July 10, 2012, were illegally seized.

236.    By consciously and deliberately overlooking the use of excessive force by subordinates, the unknown Supervisory Personnel established a pattern, custom, and practice of condoning and ratifying such misconduct and criminal activity and established a tolerated pattern of constitutional violations amongst their subordinates.  The condoning of misconduct by the unknown Supervisory Personnel was so comprehensive and well known that the subordinates were emboldened to blatantly violate the constitutional rights of Langermann and to commit violations, such as the unlawful retaliation and seizure of Langermann's Hungarian Gold Train benefits.

237.    Because of their acts and/or omissions in their failure to prevent the continuing constitutional violations by their subordinates and because of their establishment of the policies and practices described above, as well as their failure to adequately train their subordinates, the unknown Supervisory Personnel are individually liable for their own independent acts and/or omissions which were a contributing factor in causing the constitutional violations committed by the subordinates which caused the injuries to Langermann as a result of the retaliation and seizure of Langermann's Hungarian Gold Train benefits.

238.    The aforementioned acts of the unknown Supervisory Personnel of The Blue Card, Inc. and JFSA were willful, wanton, malicious, and oppressive. so as to justify an award of punitive damages according to proof.

239.    The Blue Card's and JFSA's acts were willful and oppressive so as to justify an award of punitive damages according to proof.

240.    Plaintiff requests that this Honorable Court awards compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Sixteenth Cause of Action in their individual/corporate capacities.

**Seventeenth Cause of Action**
**(Breach of Covenant of Good Faith and Fair Dealing)**

241.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 240 as though fully set forth herein and further alleges as follows:

242.    Implied in the contract between Defendants Dubbin, Cuneo, Berman and Langermann was a covenant of good faith and fair dealing.

243.    Defendants Dubbin, Cuneo and Berman failed to perform under the agreement and in compliance with their ethical obligations, thereby denying Langermann the benefit to which he was entitled to under the contract.  In so doing, Defendants Dubbin, Cuneo and Berman held their interests above that of Langermann.

244.    The attorney and client in this situation had a special relationship of trust and reliance.

245.    As a result of Defendants Dubbin's, Cuneo's and Berman's breach of the implied covenant of good faith and fair dealing they are liable to Langermann for damages in an amount to be proven at trial.

246.    Defendants' acts were willful, oppressive, and malicious so as to justify an award of punitive damages.

247.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Seventeenth Cause of Action in their individual/corporate capacities.

**Eighteenth Cause of Action**
**(Intentional Infliction of Emotional Distress)**

248.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 246 as though fully set forth herein and further alleges as follows:

249.    Defendants Dubbin, Cuneo, Berman, Rubinstein, Wrobel, The Blue Card, Inc., JFSA, and/or Does and Roes, engaged in outrageous conduct.  Such conduct was continuous, extreme, intentional, and outrageous, and such conduct was done for the purpose of causing Langermann to suffer humiliation, mental anguish and emotional distress, and was done with wanton and  reckless disregard of the probability of causing such distress, and the requirement of medical attention.

250.    As a direct and proximate result of Defendants' conduct, Langermann has suffered and will continue to suffer damages, including economic and compensatory in an amount according to proof.

251.    Defendants' acts were willful and oppressive and malicious so as to justify an award of punitive damages.

252.    Plaintiff requests that this Honorable Court award compensatory and punitive damages in an amount to be determined according to proof by Plaintiff against all Defendants named in this Eighteenth Cause of Action in their individual/corporate capacities.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure, Rule 38(b) and Florida Rules of Civil Procedure 1.430(b), Plaintiff demands trial by Jury for all of the issues pled so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment for:

1.  actual, general, compensatory, consequential and economic damages in an amount in excess of $100,000.00 per each defendant pursuant to each cause of action;

2.  punitive damages in an amount in excess of $100,000.00 per each defendant pursuant to each cause of action;

3.  double damages pursuant to NRS 41.1395;

4.  actual and punitive damages pursuant to FSA 415.1111;

5.  interest at the lawful rate per annum;

6.  costs, expenses, reasonable attorney's fees due to Pro Se litigants  pursuant to Inter alia, 42 U.S.C.A. § 1988, and other applicable federal and state laws;

7.  such other and further relief as this Honorable Court may deem just and proper.

**DATED this** 6 **day of** AUG , **2014.**

By:

ROBERT LANGERMANN
P.O. Box 19724
Las Vegas, NV   89132
Plaintiff in Pro Per

## VERIFICATION

STATE OF NEVADA      )
                            )  ss:

COUNTY OF CLARK     )

        ROBERT LANGERMANN, being first duly sworn, deposes and says:

        That I am the Plaintiff in the above entitled action;

        That I have read the foregoing complaint and know the contents thereof; that the same is

true of my own knowledge, except as to those matters I believe them to be true.

                                          ROBERT LANGERMANN

SUBSCRIBED AND SWORN to before
me this 6TH day of AUG , 2014.

_Stanley F Flacks_
NOTARY PUBLIC in and for Clark
County, State of Nevada

> NOTARY PUBLIC
> STATE OF NEVADA
> County of Clark
> STANLEY FLACKS
> No: 99-57969-1
> My Appointment Expires Aug. 2, 2015



# PRIORITY MAIL

UNITED STATES POSTAL SERVICE

## Flat Rate
## Mailing Envelope

**For Domestic and International Use**

*Visit us at usps.com*

PLEASE PRESS FIRMLY

PLEASE PRESS FIRMLY

USPS TRACKING #

4 999 4423 8248 5486 72

LAB400R  Aug. 2013
7690-17-000-0669



From Robert Langermann
P.O. Box 19724
Las Vegas, NV 89132

TO United States District Court
Add N. Miami Ave., 8th Floor
Miami, FL 33128

Label 228, January 2008

Country of Destination/Pays de destination:


Recycled Paper

POSTAL SERVICE

1006

33128

$5.60
0028861-07

EP14F

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments.
Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; Oct. 2008; All rights reserved.